Meredith Holley (she/her), OSB No. 125647
Meredith@ErisResolution.com
Law Office of Meredith Holley
207 E 5th Avenue, Suite 254
Eugene, OR 97401
Phone: (458) 221-2671
Fax: (833) 352-3615
  Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| AMY BAILEY,<br>          Plaintiff,<br><br>          vs.<br><br>STATE OF OREGON, OREGON YOUTH AUTHORITY, an Oregon state youth correctional agency,<br>          Defendant. | Case No.<br><br>COMPLAINT<br>(Hostile Work Environment Sexual Harassment, Fourteenth Amendment Equal Protection Violation)<br><br>*Demand for Jury Trial* |

**INTRODUCTION**

1.

Between 2017 and 2021, approximately 85-87% of youth in Defendant Oregon Youth Authority (OYA) correctional facilities have been boys. Defendant OYA's Rogue Valley Correctional Facility houses only incarcerated boys. At all times, the majority of both supervisory and non-supervisory employees at Defendant's Rogue Valley Correctional Facility have been male.

2.

Around one in six boys experiences sexual assault before the age of 18. Approximately 95% percent of all perpetrators of sexual assault are male.

COMPLAINT – Page 1

3.

Despite the overwhelming majority of sexual offenders being male, Defendant's Rogue Valley Correctional Facility has a custom, policy, or practice of sexualizing female staff and disproportionately accusing female staff of sexual impropriety with male youth, without evidence of wrongdoing.

4.

Interactions sexualize women when they disproportionately refer to women's bodies and neutral actions in a sexual manner compared to men's bodies and actions. This is a form of objectification, which means that it treats women's bodies as sexual objects for male enjoyment. Sexualizing and objectifying women increases and perpetuates discrimination, harassment, and even violence against women.

5.

Plaintiff Amy Bailey worked for Defendant's Rogue Valley Correctional Facility as a unit manager and was one of only two female supervisors in the facility, from 2017-2020. In 2017, Ms. Bailey reported sexual harassment from a male subordinate that was so severe, it culminated in the male employee breaking into Ms. Bailey's home. Defendant OYA took no action regarding her report, but instead her supervisors told her to "deal with it." Ms. Bailey experienced male staff sexualizing her actions and speech approximately daily. Her male supervisor required Ms. Bailey, as a condition of her job, to accuse women subordinates of inappropriate interactions with male youth, although to Ms. Bailey the interactions appeared innocent. When another male staff member, Vince Lackey, began sexually harassing Ms. Bailey and pressuring her to have a sexual relationship with him, she told him to stop and that he was scaring her. Knowing Defendant has a custom, policy, or practice of sexualizing and not believing women, Vince Lackey accused Ms. Bailey of sexually harassing him in order to prevent her from accusing him. Defendant relied on Ms. Bailey writing "hug bug" on a sticky

note and reprimanding Lackey for dangerous practices related to a dirty needle as reasons to terminate her employment.

## JURISDICTION AND VENUE

6.

This matter arises under federal law, 42 U.S.C. 2000e *et seq* and 42 U.S.C. § 1983. Supplemental jurisdiction over related state law claims is proper under 28 U.S.C. § 1367.

7.

Defendant Oregon Youth Authority, an Oregon state agency, is the only defendant in this case and has correctional facilities doing business in youth incarceration in Salem and Eugene, Oregon, making Eugene Division proper venue under 28 U.S.C. § 1391(b).

## PARTIES

8.

Plaintiff Amy Bailey is a resident of Josephine County, Oregon. Ms. Bailey was employed with Defendant OYA at its Rogue Valley Correctional Facility in Josephine County at all times pertinent to this complaint. Ms. Bailey is a woman. She is a certified alcohol and drug treatment counselor with decades of experience in dialectical behavioral therapy, crisis de-escalation, substance abuse, and youth programs.

9.

Defendant State of Oregon, Oregon Youth Authority (OYA) is an Oregon state agency that operates youth correctional facilities around the State of Oregon, including in Salem, Eugene, and Grants Pass, Oregon. Defendant employed Plaintiff from 2017 through 2020.

## FACTUAL ALLEGATIONS

10.

Defendant hired Ms. Bailey in February 2017 as a Living Unit Manager at Rogue Valley.

COMPLAINT – Page 3

11.

During her first week of work, another unit manager, Cathy Byrne, told Ms. Bailey, "Admin is crazy for hiring someone who is a single mom and thinks they can do this job." Throughout Ms. Bailey's time working for Defendant OYA's Rogue Valley Correctional Facility, she was the only unit manager who was a mother. For most of her employment with Defendant, Ms. Bailey was also the only woman on the treatment team.

12.

In Ms. Bailey's first few weeks of work, she reported to her supervisor, Program Manager Randy Guisinger, excessive and cruel treatment of youth by other members of the treatment team. Mr. Guisinger told Ms. Bailey that she needed to "do things differently in order to fit in."

13.

Throughout Ms. Bailey's employment, she reported to Program Manager Guisinger that she believed she was held to a different standard than her male colleagues and routinely sexualized as a woman both in front of the youth and among employees. The following are examples of what she reported as the issues occurred:

a) In her initial training working with youth in isolation in 2017, Ms. Bailey followed Program Manager Guisinger. He gave the youth a hug at the end of a session of work. Shortly after training, Ms. Bailey was working with a youth who had been triggered by a fight. Ms. Bailey used a touch grounding technique where she asked him to take her hand. A staff member told Ms. Bailey later that male staff had accused Ms. Bailey of "touching youth," implying that Ms. Bailey had engaged in inappropriate touching. Both Ms. Bailey and Mr. Guisinger engaged in neutral, respectful, consensual touching with youth, but male staff sexualized Ms. Bailey's experience.

b) Also when Ms. Bailey first started, male staff members engaged in violent and threatening behavior with youth and herself. For example, on February 28, 2017, a

colleague named Weider, who was subordinate to Ms. Bailey, aggressively approached a youth with fists clenched as though he was going to physically fight him. When Ms. Bailey intervened, Weider raised his voice to Ms. Bailey and aggressively tried to undermine her with the youth, saying he was not going to follow her directives. Security had to intervene. Around March 2017, a different subordinate named Jones grabbed a youth by the wrist and yanked him out of a chair. In May 2017, Ms. Bailey reported to Program Manager Guisinger that Weider was aggressive with youth and defiant of her supervision. Instead of supporting Ms. Bailey, Program Manager Guisinger told her that she needed to communicate better with Weider and deferred to him because he is a man. These male staff were violent with youth, but did not face the accusations of "inappropriate touching" that female staff faced.

c) On June 29, 2017, Weider undermined Ms. Bailey's authority with a youth again, saying "Fuck [Superintendent] Jerin, he's not running this program. I am." Program Manager Guisinger simply gave Weider a Letter of Expectation, despite the consistent physical aggressiveness and undermining of Ms. Bailey's authority. After that, Weider began to target Ms. Bailey, and Program Manager Guisinger did nothing to respond. For example, at the disciplinary meeting in which Program Manager Guisinger and Ms. Bailey presented the Letter of Expectation to Weider, Weider accused Ms. Bailey of "touching and feeling up another staff in her office where all the youth could see." This was clearly not true, and Weider only said it to undermine Ms. Bailey's authority by sexualizing her as a woman. Guisinger did nothing to investigate it either to protect youth or protect Ms. Bailey's authority as a supervisor.

d) Approximately a week later, a staff person approached Ms. Bailey and told her that Weider was making a lot of nasty and negative comments about Ms. Bailey around the facility, including the statement he made about "feeling up" a staff member. Weider also

said Ms. Bailey could not handle the way he communicates because Ms. Bailey was "beaten by her father." Ms. Bailey had never shared personal history with the staff, and she believes this created the impression that she was sharing personal information and that she was a victim of domestic violence. Ms. Bailey reported this to Program Manager Guisinger, and he did nothing to correct Weider's behavior.

e) Around the same time, a female staff member, who had worked for Defendant longer than Ms. Bailey told Ms. Bailey she had also reported Weider for violence and received no response. This female staff member told Ms. Bailey supervisors intervened when male staff members had concerns, but not when female staff members had concerns.

f) In late 2018, a male staff member confronted a female staff member, saying youth had accused her of making a sexual comment. The female staff member was so distressed that she had to go home that day. Ms. Bailey was the officer on duty, and she reported the incident to Administration. It seemed like the male staff member was using the youth to target female staff. After this report Cathy Byrne, who was moving into a Program Manager role, started a women's "support" group. Ms. Bailey went to the group and saw many women give examples of how they felt unfairly treated because they were women and how the male staff sexualized their interactions with youth. No investigations came from these reports, and Program Manager Byrne brushed off concerns. Soon after that, the targeted female staff member quit because the issues were never addressed. The group disbanded and nothing changed.

14.

From 2017 through October 2019, a male staff person, Jason McKinley, targeted Ms. Bailey with sexual harassment including text messages, sexualized comments, and pressuring her to meet with him outside of work. On May 20, 2019, McKinley broke into Ms. Bailey's garage at night. Her children told her that he had come to their home while Ms. Bailey was not there and given

them candy and balloons. Ms. Bailey consistently reported McKinley's harassment to Program Manager Guisinger and Superintendent Jerin, and they did nothing, telling Ms. Bailey to "handle it." In April 2019, Superintendent Jerin gave McKinley a "director's coin," even though Ms. Bailey asked him not to and told him it would undermine her.

15.

In August 2019, Ms. Bailey went on medical leave in part because of her anxiety over McKinley's harassment and Defendant OYA's lack of response. In October 2019, McKinley was placed on administrative leave for harassing another female staff member. Ms. Bailey reported the harassment she experienced to HR but was never interviewed in its investigation of McKinley.

16.

In January 2020, Superintendent Jerin and Program Manager Guisinger required Ms. Bailey to attend a meeting with Human Resources. Ms. Bailey found out McKinley had accused her of having "boundary issues" with youth, which again appeared to sexualize her as a woman and retaliate against her for refusing to accept his sexual advances. To Ms. Bailey's knowledge, Mr. McKinley's sexual harassment of her was never addressed or considered in his investigation.

17.

Around November 2019, Program Manager Cathy Byrne told Ms. Bailey that she tells female staff to wear loose clothing, not to use "female mannerisms" like tossing their hair, to wear their hair up, wear minimal or no makeup, and not to have any individual conversations with youth. Program Manager Byrne said that Ms. Bailey needed to work with female staff on this. Program Manager Byrne told Ms. Bailey that Ms. Bailey needed to restrict a female staff member from being within 10 feet of youth that had expressed having a crush on that female staff member. This would have been impossible to supervise and would have made it impossible for the female

staff member to do her job. Program Manager Byrne's expectations targeted the staff member for being a woman rather than addressing inappropriate youth behavior.

18.

From January 2020 through the end of July 2020, Ms. Bailey's unit was understaffed, which required her to work many shifts on the floor. Ms. Bailey asked for the third shift to be staffed many times early on, but suddenly the problem increased: around February 2020, Ms. Bailey did not have a third staff member scheduled for day shift. Program Manager Byrne required Ms. Bailey to work on the floor to fill in shifts, but no male unit managers were required to do that. At the end of July 2020, a male staff member emailed Program Manager Guisinger about the problem, and suddenly the staff numbers were restored. Ms. Bailey was the only female unit manager since Cathy Byrne became a program manager, and it seemed, again, like administration did not listen to Ms. Bailey because she is a woman.

19.

Around May 2020, a female staff member told Ms. Bailey that she had reported an incident in which a male staff person made inappropriate comments to her and another female staff member. That female staff person said Program Manager Byrne discouraged her from reporting to Administration. The female staff member said that she reported to Human Resources anyway, but she never heard anything back.

20.

In July 2020, a female staff member told Ms. Bailey that a male staff member told her there was a rumor in the Facility, saying she and Ms. Bailey are lesbian lovers. Ms. Bailey reported this to Program Manager Guisinger, and continued to raise this sexualization of female staff approximately weekly to Program Manager Guisinger in their supervisory meetings.

21.

Around August 2020, a female staff member told Ms. Bailey that she was afraid to speak to the youth because male staff members made sexualized comments about any interaction she had with them. She said she had worked previously for Department of Corrections and had seen "nothing like it." Ms. Bailey asked her if she would like to provide specifics so that Ms. Bailey could report this, and the female staff member said she was afraid to do that because she hadn't worked there long enough and feared she would lose her job. That female staff member later quit. Ms. Bailey believes she quit because of the targeting women experienced. Based on her experience of being targeted, Ms. Bailey was afraid to report this incident to Program Manager Guisinger or Superintendent Jerin because she did not want the female staff member to experience more targeting. Because Human Resources had not responded in the past, it seemed like the female staff members had no options.

22.

In February or March 2020, Vince Lackey started working in Ms. Bailey's unit. Mr. Lackey had worked for Defendant OYA for approximately 20 years, much longer than Ms. Bailey, and her supervisors deferred to Lackey because he was a man in a way that they did not defer to Ms. Bailey. Lackey began asking Ms. Bailey personal questions about her romantic relationships and pressuring her to meet with him outside of work. Ms. Bailey declined to answer and said she would not meet him outside of work. Lackey continued to pressure Ms. Bailey to meet him outside of work, told Ms. Bailey details about his sex life, and told her he understood "why people cheat" on their spouses because of her. Ms. Bailey consistently told Lackey that she would not meet him outside of work or participate in a romantic relationship with him.

23.

Ms. Bailey told Lackey that her supervisors treated her differently as a woman. Lackey said male managers were not held to the standard she was and that male managers were allowed to meet

with staff outside of work. Ms. Bailey said that she wanted to be very careful to follow rules because of the double standard and that she did not want to create any appearance of an inappropriate relationship.

24.

In late July 2020, Lackey told Ms. Bailey that the week before, he had been near her home. He said, "I was going to surprise you and stop by, but I didn't know if it would make you uncomfortable." Ms. Bailey was shocked and said that he did not know where she lived. He explained that he knew the general area where Ms. Bailey lived and was going to go through the neighborhood looking for her car. Ms. Bailey told him that she could not believe he would threaten to do that because he knew that was the harassment she experienced from McKinley. Ms. Bailey told him that she would never ever meet him outside of work. Lackey said he was afraid Ms. Bailey would report him for sexual harassment. Ms. Bailey told him that she just wanted to move on and that based on her experiences, she did not think administration would listen to her, anyway, if she tried to report him.

25.

The next week, on August 10, 2020, Administration at Defendant OYA told Ms. Bailey she was being suspended from work because Vince Lackey had accused her of sexually harassing him. In the course of the investigation into Ms. Bailey, she reported Lackey's sexual harassment. Upon information and belief, Vince Lackey, like the other men who harassed female staff at Defendant OYA's Rogue Valley Correctional Facility, faced no consequences for his harassment of Ms. Bailey.

26.

On October 16, 2020, Plaintiff filed a Tort Claims Notice under ORS 30.275.

27.

On January 21, 2021, Plaintiff filed a complaint with the Oregon Bureau of Labor and Industries and the federal Equal Employment Opportunity Commission.

28.

On April 24, 2021, Defendant OYA terminated Plaintiff's employment. For termination, Defendant relied on allegations that Ms. Bailey wrote "hug bug" on a post it note and that she reprimanded Lackey for unsafe practices regarding a used tattoo needle confiscated from youth.

29.

On August 17, 2021, the Oregon Bureau of Labor and Industries issued Plaintiff a 90-day right to sue letter.

30.

Defendants' actions and inactions have caused Plaintiff harms in an amount to be determined by a jury at trial, including medical expenses, wage loss, severe emotional distress including humiliation, pain, sleeplessness, degradation, despair at the loss of a career in which she felt she was making a positive difference, and other emotional traumas.

**FIRST CLAIM FOR RELIEF – ORS 659A.030**
**HOSTILE WORK ENVIRONMENT SEXUAL HARASSMENT**

31.

Plaintiff repeats and realleges paragraphs 1-30 as though fully set forth.

32.

Defendant violated ORS 659A.030 by subjecting Plaintiff to unwanted, offensive verbal or physical conduct based on Plaintiff's sex, which was severe or pervasive enough to alter the conditions of Plaintiff's employment and create a work environment that a reasonable person in plaintiff's circumstances would consider to be abusive or hostile enough to alter the conditions of Plaintiff's employment. Plaintiff perceived the environment to be abusive or hostile. Defendant

and/or members of Defendant's management knew or should have known of the harassment and failed to take immediate, appropriate remedial action reasonably calculated to end the harassment as described above, culminating in Defendant suspending Ms. Bailey from work and ultimately terminating her employment.

33.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination against her protected characteristics, reporting those, and receiving no support or response from Defendant, compensation for which is to be determined by a jury at trial.

34.

Plaintiff is entitled to reasonable attorney fees and costs under ORS 659A.885.

## SECOND CLAIM FOR RELIEF – TITLE VII
### PROTECTED CHARACTERISTIC DISCRIMINATION – HOSTILE WORK ENVIRONMENT

35.

Plaintiff repeats and realleges paragraphs 1-34 as though fully set forth.

36.

Defendant violated Title VII of the Civil Rights Act of 1964, 42 USC § 2000e, *et seq.,* by subjecting Plaintiff to unwanted, offensive verbal or physical conduct based on Plaintiff's sex, which was severe or pervasive enough to alter the conditions of Plaintiff's employment and create a work environment that a reasonable person in plaintiff's circumstances would consider to be abusive or hostile enough to alter the conditions of Plaintiff's employment. Plaintiff perceived the environment to be abusive or hostile. Defendant and/or members of Defendant's management knew or should have known of the harassment and failed to take immediate, appropriate remedial action reasonably calculated to end the harassment as described above,

culminating in Defendant suspending Ms. Bailey from work and ultimately terminating her employment.

37.

Defendant's violations have caused and continue to cause Plaintiff financial and non-financial harms including wage loss, humiliation, stress, anxiety, sleeplessness, panic, degradation, and betrayal at experiencing repeated slurs and other discrimination against her protected characteristics, reporting those, and receiving no support or response from Defendant, compensation for which is to be determined by a jury at trial.

38.

Under Title VII, 42 U.S.C. 2000e-2, Plaintiff is entitled to reasonable attorney fees and costs to be determined by the court.

### THIRD CLAIM FOR RELIEF – 42 U.S.C. § 1983
### VIOLATION OF FOURTEENTH AMENDMENT EQUAL PROTECTION - MONELL

39.

Plaintiff repeats and realleges paragraphs 1-38 as though fully set forth.

40.

At all material times the administration of Defendant OYA was acting individually and jointly under color of state law and within the scope of their employment for Defendant OYA.

41.

Defendant maintained an official policy or widespread, longstanding practice or custom of sexualizing, objectifying, and disproportionately accusing female staff of sexual misconduct with male youth, including but not limited to training new staff that women were more likely to be sexual perpetrators against youth and disproportionately disciplining female staff compared to male staff.

42.

Defendant's actions and inactions have caused Plaintiff harms in an amount to be determined by a jury at trial, including therapy expenses, wage loss, severe emotional distress including humiliation, pain, sleeplessness, degradation, suicidal thinking, and other emotional traumas. Ms. Bailey loved her job at OYA Rogue Valley as it pertained to the good she was doing for the youth there. Compensation for Ms. Bailey's harms should be determined by a jury at trial.

43.

Under 42 U.S.C. § 1988, Plaintiff is entitled to reasonable attorney fees and costs to be determined by the court.

WHEREFORE, Plaintiff Amy Bailey prays for judgment against Defendant as follows:

a. Economic damages in the form of wage loss and medical expenses in an amount to be determined at trial, and prejudgment interest thereon;

b. Fair and reasonable compensatory damages to be determined at the time of trial; and

c. Reasonable attorney fees and costs incurred herein under ORS 659A.885, 42, U.S.C. 2000e-5, and 42 U.S.C. § 1988.

DATED this 12th day of November, 2021.

Meredith Holley (she/her), OSB No. 125647
Meredith@ErisResolution.com
Law Office of Meredith Holley
207 E 5th Avenue, Suite 254
Eugene, OR 97401
Telephone: (458) 221-2671
Fax: (833) 352-3615
Attorney for Plaintiff

COMPLAINT – Page 14